Anita Hoden-Steiner et al. v. Genzyme Corporation and 15-1447 Phillip Adamo v. Genzyme Corporation Good morning. May it please the Court, Matt Kurzweig on behalf of the appellants, in this case the Abray patients. At its heart, this case is a pleading standard case. The issues on appeal have been very much narrowed from the opinion that was authored by the District Court in this case. And the central issue is whether or not the so-called acceleration injury claims should survive. As the Court is aware, the District Court took upon itself to classify the injury claims in this case into three categories. It was the natural progression injuries, that is, those injuries that Abray patients would have suffered anyway in the natural course of their disease. The second was the acceleration injuries, that is, injuries that were made worse or made the condition of the patient worse or accelerated by taking the reduced dose in this case. And the third was the contamination, so-called contamination injuries. Ironically, in the case, the allegations that supported the natural progression claims were the same allegations that were made in support of the accelerated injury claims. The only difference between those two is that the District Court found that the natural progression injuries were not cognizable. In other words, we have a case called Schubert. We have a case called Lacognata that says very clearly there is no duty to supply the market. Counsel, do you take issue with the District Court's classification of the claims asserted into these three branches? Your Honor, I don't. Okay. I really don't. I think it was... I think it's a useful device for analyzing the case, but I just wanted to be certain that everyone was on board with it. Your Honor, I'd agree with that. Obviously, the case was pled in various counts, including product liability claims as well as negligence claims, et cetera. But the classifications used by the District Court were, in fact, helpful. And to go back to the point that I was making, which is the allegations in support of this natural progression claims are the same ones as the accelerated injury claims, in the sense that the District Court found that the natural progression claims are barred because of this failure. There's no duty to supply, right? We relied on Schubert. We relied on Lacognata. But the accelerated injury claims were specifically identified in Schubert as being cognizable. And, in fact, the District Court in this case said the same thing. Yes, to the extent that the plaintiffs have alleged an injury that is separate apart from the natural progression of this disease, as a result of taking the reduced dose, we're going to allow those claims to proceed. But he said, unfortunately, we have a problem. Yes, Counsel. You assert here, and you assert in your brief, that you are not relying upon the duty of the appellee to supply the drug. And yet, this is language from your reply brief. And this goes to, I guess, your accelerated disease claim. You say that, as the Fabry patients alleged, during the pertinent time, Genzyme manufactured only diluted doses, therefore reduced doses, not full doses. By providing, yes, not full doses. Excuse me. Therefore, reduced doses, not full doses, semicolon. By providing diluted doses, Genzyme prevented appellants from receiving full doses and caused harm as a result. I read that sentence, and what it seems to say is that because of their inability to provide full doses, because of all the production problems they had, the best they could do was provide diluted doses, and then those diluted doses caused the harm that you described. But that strikes me, just the way you formulate it, as an assertion that this problem arises, the ability to provide only diluted doses, because they were not able to supply the full doses. So it seems to me, even as you formulate it, you are relying upon their underlying duty to provide full doses, to provide a supply. So why am I misreading what you're saying there? Excellent question. Here's the answer. So when faced with a drug shortage, Genzyme made a decision, right? And let's assume that they only have 30 percent of the available drug, enough for 30 percent of the available drug population in the United States, putting aside the European population, which they fully dosed. We'll talk about that later. But assuming they only have 30 percent of the required amount for the United States patients, they had a decision, right? They could either, A, give everyone 30 percent of the prescribed amount, of the amount that's actually approved by the FDA, which, of course, is off-label use. They could withhold the drug altogether until some point in the future, when they had enough to fully dose everyone who needed it. Or they could choose to perhaps triage, right? In other words, identify those members of the very population that were in most need of this drug and give them full doses. If they had done anything other than number one, they'd be insulated from liability under Schubert, right? Because there is no duty to supply drugs generally that any court has ever found. If they had simply withdrawn any distribution of this drug whatsoever, they could hide behind Schubert and say, listen, we haven't done anything wrong here. We haven't underdosed anyone. We haven't violated the FDA-approved amount. And there would be no case, period. Or if they triage and give some people full doses, then those folks would have had full dose. They would have no injury. And the people that didn't get a dose, they'd also be insulated from liability because there is no duty to supply. So I think I'm trying to answer the question in the sense that I'm not arguing that by giving people 30% doses, that Genzyme had no choice, and therefore they've acted appropriately here. So you're saying that by choosing option one, by providing a diluted dose, they were representing to those patients who took that diluted dose that you at least will be better off by taking this diluted dose than you would be if you didn't do anything to treat your disease. And it turned out, I guess your allegation, that those diluted doses had the effect of accelerating the disease. Is that sort of the theory of your claim? That is exactly the theory of the claim, Your Honor. And we've pled also in the complaint that they knew about the dangers associated with the reduced dose. And, in fact, the only difference between the so-called accelerated injury case claims and the natural progression claims is the existence of stapling the EMA report to the complaint. Remember this issue being raised in the briefs, right? So when the district court looked at that and they said, okay, well the allegations here are that plaintiffs suffered natural progression injury, but they also suffered accelerated injury. All the plaintiffs is what we pled. But the court then created an ambiguity by looking at the EMA report that was stapled to the complaint, metaphorically, and said, well, wait, the EMA report says that, you know, in certain situations we have seen some Febrez patients suffer symptoms that are akin to accelerated natural progression-type symptomology. We stapled that to the complaint, but we also said very clearly that all Febrez patients have suffered not only natural progression injuries, but also accelerated injury. And so what happened is that the court, you know, constructed an ambiguity by saying, wait, the EMA report only talks about some patients. You talk about all of them in the complaint, but you don't tell us that which of the named plaintiffs would fall within that some of the plaintiffs or some of the patients category as identified in the EMA report. But the court didn't construct the ambiguity. The ambiguity was in the complaint because the complaint has to be read with the attachment. The attachment is more specific. You put the EMA report before the court. The court didn't just green the box. Respectfully disagree, Your Honor. What happens is that if the plaintiff attaches evidentiary information to his complaint, the case law is clear. It should be construed, especially in a 12v6-type situation, to augment the allegations of the complaint. The allegations of the complaint were very clear in the sense that they said that all of the patients suffered an accelerated injury in the case. Yeah, that may be fine under the old pleading standard, but we're dealing here with plausibility, right, and a general allegation that is contradicted by specific material incorporated by reference in the complaint. That casts grave doubt upon the ambiguity of the general statement when the specific material limits it. It's not contradicted, Your Honor. It is enhanced in the sense that the EMA study specifically identifies that accelerated problem. And says it affects some contemporary patients. We have seen it affect some of the patients. So, counsel, is it your position then that as to which, given the narrowing now of your claim, as to which plaintiffs are subject to that phenomenon of accelerated symptoms because of the diluted dosage, that's all for the discovery phase of the case to sort out, that defendant can pose interrogatories, do whatever it wants to do as part of discovery, and can then, through that process, find out which of the plaintiffs, in fact, again, have been subject to that phenomenon. Is that your position? Well, yeah, it's my position. It is, in fact, the case. In fact, you know, the district court below, when it said that we adequately pled the natural progression case, right, because we don't have, we can't, it's not a cognizable case. But when it said that we adequately pled that those individuals that took Redose, it was ineffective, and they had a natural progression of the disease, and that caused harm. It said in the district court opinion, you know, defendants have the ability to engage in discovery and to, you know, basically identify the exact nature of this natural progression harm. The ironic thing is when it kicked out the accelerated harms, the district court didn't say that. So what it did was a very sort of odd thing, right? It says that the same allegations that exist for natural progression claims exist for accelerated claims. Plaintiffs, now appellants, adequately pled those natural progression claims. Well, that's because it said, it read the allegation to be that all of the named plaintiffs had experienced that phenomenon. Right. So it didn't have that concern about a smaller subset experiencing phenomenon and which plaintiffs are in that smaller subset. That did not apply to the natural progression. Isn't that what the district court was saying? That's what they were saying, and then what they took that one extra step further with the acceleration claims, and they said, although you plaintiffs have juxtaposed those two concepts in your complaint, in the pleadings, you've said on the one hand they've had progression, but the deterioration was accelerated for plaintiffs as well. That juxtaposition wasn't in the EMA report because they said that we've observed it in some of the patients. And so what they used that evidence, evidentiary issue, to create an ambiguity that wasn't there. In fact, we would be better off had we not stapled that report to the complaint. And in fact, if that report were not a part of the complaint, there would have been no basis for the district court to distinguish between the pleading of the accelerated injury cases and the natural progression cases, and they would have had to, to be logically consistent. Isn't that also true of the contamination cases? Yes. You didn't separate those out either, but that seems implausible. No, I don't think so. So you were alleging that all of the plaintiffs suffered from contamination. In the complaint, we alleged certain contamination issues. There's no question about it. And when we went to identify the harms that were associated with the various claims, we talked about acceleration of the natural progression. We talked about actual injury as a result of the diluted dose. Those contamination claims are not within those paragraphs. I see. Okay. So that's why I'm, before this panel, making that distinction between the two, I think, very relevant issues, which is the progression claims and the acceleration claims. Two other points, and I'm not sure why I'm on time. You have half a minute. Really? Okay. Well, I'll spend 15 seconds on both. The first is this Mooney claim, right? So we made a big point in the brief about Mooney having something special about his pleading and something special about his pleading is that he experienced this severe allergic reaction when he went back on the full dose. And at oral argument on the motion to dismiss, the district court appreciated that difference and said, now, isn't there something different about Mooney here, and paraphrasing, in the sense that he has an actual specific injury? And we agreed with that. Nowhere in the district court opinion is there any reference to this Mooney distinction whatsoever. And the reason for that, I would submit, is that if you as a district court acknowledge that Mooney is somewhat different, the case has to survive, right? Because Mooney is something different than a natural progression case that's not cognizable. And we specifically fled that one. So he can't mention that, the same way he doesn't mention the class action allegations in the complaint. The final point that I'm going to make, and I know I'm out of time, is in this regard to need to amend, right? Case law is very clear that there should be some ability to correct a deficiency once the plaintiff, now appellant, is aware of that deficiency, okay? Now, you're going to hear in the next 15 minutes the plaintiff had five amended complaints. We have your brief on this. Okay. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Robert Jones, on behalf of Genzyme, with me, Mark Gaglione at the table. And I think the place to start is with this accelerated harm. Well, I'm going to start you in a different place because I'm trying to get my head around why this action doesn't survive as commuted. With respect to Mr. Mooney? Mm-hmm. Your Honor, while the claim on the part of the plaintiff is that Mr. Mooney isn't embraced in some way by the district court's opinion, I would respectfully disagree. I think if you look at the way that Judge Woodlock I'm not talking about what Judge Woodlock did or didn't do. I'm talking about why the case shouldn't survive as to Mooney. It seems that Mooney is the one plaintiff where there has been a definite injury alleged. He's got an injury in fact. He's alleged an injury in fact. He's traced the injury in fact to what happened with the withdrawal of the full dosage of Fabricide. And I'm struggling with the notion of why his claim should be dismissed along with everybody else's. Well, if you understand the gist of Mr. Mooney's claim to be that he has now been exposed to the natural progression of disease symptoms because of the sequence of events that he, as you indicate, Your Honor, alleges with some concreteness, then what you have is the first category of the district court's opinion, which was not dismissed at a pleading standard stage, at a no-displeasing stage, but instead was allowed by the district court to have been adequately alleged in that respect. And the district court then moves on to analyze those causes of action, no private cause of action, no third-party beneficiary, no duty to supply. It was really dismissed on the basis of rulings that haven't been challenged on appeal here by the plaintiffs. But that's the category that Mr. Mooney would fall into. To the extent that Mr. Mooney is alleging that he has experienced some accelerated disease progression, I think he falls then into that second category. And even allowing that he gets past in a way that's maybe different than all of the other plaintiffs, maybe he gets to the starting line because there's a little bit more concreteness in the allegation of the anaphylactic reaction. Then there's the requirement under whatever state a particular plaintiff lives in, in this case it's Ohio in Mr. Mooney's case, that he satisfy whatever state law, common law, or statutory causes of action require him to plead in order to state a case. And in that case we need to know what is Mr. Mooney alleging actually. It's not just a products liability case. Is this a design defect case? Is he alleging a manufacturing defect? Is it a breach of warranty case? What is the nature of the theory that he's proceeding on? Because with respect to each of those there's an answer. There's a failure to plead. There's a way to get at that case. And in the event that you address all of those questions you then also have to wonder whether in the case of Ohio a court is going to set up a duty on the part of Genzyme to supply Ohio patients with a full dosage of a particular biologic therapy in a regulatory regime where it does not have that obligation in 49 other states. And whether this court to the university would expand really the reach of the Ohio Products Liability Act in that way to embrace Mr. Mooney's claim specifically. Now what the court actually did was it said that to the extent that Mr. Mooney was alleging natural progression, he's in that first category. He adequately pled and so did everybody else. But there's no actionable claim. And what the district court did with the second version of the theory, which really he did by squinting and turning sideways and giving the complaint more credit arguably than it was due, is to say maybe there's this other category of harm we'll call different or accelerated disease symptoms. But I don't find anywhere where any plaintiff, including Mr. Mooney, has really alleged that that's what they're exposed to, that there have been disease symptoms or progression of disease that's something other than the natural progression. There's a conclusory allegation about it. There's the reference in the EMA report, which the court found not to be on point. But in any event, he didn't find that it was there. Well, the appellant has said that they accept certain portions of the district court's decision, even find these imposed categories somewhat helpful. And now here on appeal, as part of this narrowing process, they say that they are making a claim that is not dependent at all on this duty to supply, that it's in fact a claim that because your client indicated to patients whose well-being is dependent on this drug, that they would be better off taking this diluted dose rather than no dose at all because of the reduced supply. And having now experienced that diluted dose, they are experiencing an acceleration of their disease. And Mr. Mooney's experience is a subset of that phenomenon, that he, in fact, because of taking the diluted dose, when he was able to commence the full dose, he experienced this anaphylactic reaction. So that seems to be a subset of that accelerated category. What's wrong with that as an articulable theory that should survive at this stage of the case? Well, there are two or three problems with it, and I want to go through them, Your Honor. I think it's really important to get clear what we are saying in light of what was done below. But let me start by clearing up terms. When we use the phrase diluted dose, it suggests, perhaps, that there is some sort of mixing of water into a dose. What we're really talking about is just less fluid. Yes, I understand that. I just want to make sure the terminology is clear. I agree with you that with respect to Mr. Mooney at least understanding his harm alleged to be a certain type, that he does fit into that second category that the district court identified. There's a problem with that category at the pleading stage, and that's what the ruling was below. And I want to describe why we think that was right. But then I will move on and talk about plausibility and other aspects that, if this court were to find that they pled adequately notice pleading-wise, we still think that they would be out of court. At the notice pleading stage, they are not relying in all of the same ways, in all of the same respects on the allegations that the natural progression category is. And here's one way you know. There are plaintiffs in this case who never took this biologic during the shortage period, one that never took it at all until the shortage period was after. So in order to really have alleged that all plaintiffs are all. . . Excuse me. How do you know that? Because it says in the complaint with respect to. . . Fine. Plaintiff Adam Dibble, for example, Paragraph 20 of the abdominal complaint, the allegation is that he was not on Fabrizyme before the shortage began, was diagnosed after, was put on a list, and therefore did not get the therapy until after. . . So it's all from the face of the complaint that you know everything that you're stating. Yes, I'm not expanding the record at all. Same with Teresa Viers, Paragraph 73, a different story, but the same idea, which is she went off the therapy and did not have it during the shortage period. So it can't be by inference that the complaint actually sets up a credible allegation that every plaintiff was subjected to a diluted dose and therefore something that we'll describe for now is accelerated symptoms. It has to be that it's something other than all. Which is it? And in order to understand which state laws apply, which state laws are implicated, which plaintiff is actually making that allegation, we're entitled at the Rule 8 stage to a concrete allegation as to what each plaintiff is alleging that he or she did or did not experience. That's the fundamental failing. The failing that the district court identified with this category of allegations really didn't depend on this equivalent about what the EMA report meant. It really just addressed the fact that in the complaint itself, nowhere do the plaintiffs take the time to allege which plaintiffs actually are saying that the symptoms that they've experienced as a result of the shortage are in some way fairly described as symptoms that are other than the natural progression of disease because they are accelerated in some fashion. So that's a failing of the pleadings at the notice pleading stage. But even if you surmount that, you get to questions of plausibility and whether there is a cause of action that's actually been alleged. In order to understand why there's no plausibility here with respect to, or plead at least, with respect to accelerated progression, you need to know a little bit about how this therapy actually works. This is an enzyme replacement therapy that addresses the lack of that enzyme in the human body. The absence of that human enzyme in the body prevents the body from breaking down a GL3 lipid in human cells. And the use of the replacement enzyme allows the body then to begin breaking down those lipids in human cells. The allegation of accelerated harm is not just that a reduced frequency of dose allows the body to build up those lipids in the way that it normally would in the absence of the therapy, but by some mechanism that is undescribed in science that I'm aware of and certainly not described in the complaint, would actually cause the body to create more of that lipid than it otherwise would have ever, not just against the baseline of not having the therapy, but against the baseline of even having the disease. That's not articulated in the complaint. And it's not plausible. It doesn't make any sense. And in order to make sense of it, it's certainly not the way to do it. But that sounds, that's a version of plausibility that suggests the need for discovery. I mean, you clearly understand the claim that they're making. You say that that is scientifically implausible. That strikes me as a proposition that should be tested through discovery. Perhaps they have experts who can support their theory, and you have experts who can debunk it. But that does not strike me as the kind of analysis that should be done at the pleading stage. Even getting past that, even if you've gotten past the infirmity that the district court identified, which is the failure to identify which plaintiff is actually making this allegation, and even if you get past that kind of plausibility analysis that is now required in court, you then get to the question of what this allegation really is in sum. If you pull back, I think Your Honor was asking questions about this with my brother earlier, and I think it's just right. The allegation is I was exposed to this undefined, unspecified, unattributed to any plaintiff, accelerated harm, whatever that is, because I didn't get enough of the product. And you drive yourself right into Judge Woodlock's no duties by holding, which has not been challenged and is not subject, not really worthy of challenge. It's right. And in the absence of a duty to supply a full dosage to the market, there's no way for a claim there to actually be stated. And that's right, because it wouldn't make sense, as I was getting at earlier, it wouldn't make sense for Genzyme to be faced with this idea that there's a duty to supply the market in any one state or in just a handful of states in a way that would, frankly, make very little sense under the federal scheme and also present it with this sort of conflicting question of whether or not you can ever leave a market once you're in it, whether or not you can leave some patients with full doses but others get 30%. It kind of becomes an unworkable state-by-state conflict question. If the theory on acceleration is an improper dosing theory, how does that implicate any potential duty to supply or lack of duty to supply? Well, I would suggest, Your Honor, that it's really not an improper dosing theory, respectfully. It's a shortage theory. Well, they had a choice not to provide any of it. Well, the choice they had was really to respect the federal scheme, and this is where, really, Your Honor, I think it's worth thinking about the way that the FDA and the FDA's organizing statutes really do overlay this question. There's a balance to be struck by whether or not the benefit to a number of patients from having exposure to a 30% or 40% dose of the therapy is worth putting aside in place of a judgment that there might be this reaction or that reaction, frankly, without maybe having knowledge at the time about what that reaction would be. And so Genzyme and companies in this position facing the shortage just needs to make a judgment in dialogue with the FDA about what kind of accommodation are they going to make for patients when they're in this period of a shortage. Remember, we're not talking about a vaccine or some other type of disease for which there might be alternatives, for example. This is a rare disease, a rare genetic disease therapy. Counsel, there's no minimizing the difficult position your client was in, but I think the claim is that your client, whatever the intentions might have been, made a bad judgment that in deciding to provide this reduced dosage, they actually created a set of problems that perhaps they themselves did not anticipate, but there are now claims of a product liability claim, a negligence claim, that comes out of that judgment. And what's wrong with that is a legal theory. A judgment, but it was a bad judgment, and they're legally accountable for it. Well, then you need to take, I think, Your Honor, with respect, you need to take each state law cause of action and evaluate that as to whether there's some warranty that's been made that's been breached. This complaint fails to identify that. Are we talking about a design defect? This is a set of plaintiffs that actually wants more of the product. Is there a manufacturing defect? There's no proper allocation. Let's put it this way. If manufacturer can't meet everybody's needs and so makes available a 30% dose, under the no duty to supply doctrine, manufacturer obviously can't be liable for any harm that flows from the difference between the 30% and 100%, because that's part of the failure to supply. But if there is some special harm that's attributable to giving only 30%, that causes some special reaction. Or if there's some representation made in connection with the giving of the 30%, that it will have efficacy that it doesn't have or something like that, you can see potentially there'll be a cause of action, but I don't see anything like that pledged in this complaint. There isn't that last thing, to be sure. And I would add that in this situation, what you've got at the end of the day is an absence of any plaintiff who actually specifically alleges any of that. That's really a standard question. Well, because the infirmity and the pleading in this respect focused on whether or not an injury had actually been attributed to any particular plaintiff, it very much echoes in the same injury in fact and traceability arguments that are present in the Article III doctrine. Thank you.